[Cite as *Reading v. Fraternal Order of Police*, 2020-Ohio-4558.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| CITY OF READING, OHIO, | : | APPEAL NO. C-190679 |
| Plaintiff-Appellant, | | TRIAL NO. A-1901427 |
| vs. | : | *O P I N I O N.* |
| FRATERNAL ORDER OF POLICE, OHIO LABOR COUNCIL, | : | |
| Defendant-Appellee. | : | |

Civil Appeal From:   Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: September 23, 2020

*Schroeder, Maundrell, Barbiere & Powers*, *Lawrence E. Barbiere* and *Katherine L. Barbiere*, for Plaintiff-Appellant,

*Freking Myers & Reul LLC*, *Katherine Daughtrey Neff* and *Erin Heidrich*, for Defendant-Appellee.

**MYERS, Presiding Judge.**

{¶1}   In this appeal, we review the trial court's entry denying a motion to vacate and confirming an arbitrator's award that modified the discipline imposed upon Reading Police Officer Anthony Roth from a termination to a five-day suspension.  Because the arbitrator's award drew its essence from the collective-bargaining agreement ("CBA") executed between plaintiff-appellant the City of Reading, Ohio ("Reading") and defendant-appellee the Fraternal Order of Police, Ohio Labor Council ("FOP"), we affirm the trial court's judgment.

### *Factual and Procedural Background*

{¶2}   Reading terminated the employment of Officer Roth in February 2018 for his failure to meet departmental standards of performance in the fourth quarter of 2017, following multiple years of subpar-performance ratings.  The FOP, on behalf of Roth, filed a grievance challenging Roth's termination.  It argued that Roth was terminated without just cause, in violation of Section 10.1 of the parties' CBA, and that Reading failed to follow the principles of progressive discipline in violation of Section 10.2 of the CBA.

{¶3}   Section 10.1 of the CBA, titled "Corrective Action for Cause," provides that "[n]o employee shall be reduced in pay or position, suspended, removed, or reprimanded except for just cause."  And Section 10.2, titled "Progressive Action," provides that:

> The principles of progressive corrective action, as recognized and
> defined by the City of Reading, will normally be followed with respect
> to conduct which could not be a violation of law or classified as gross

2

misconduct. The progression normally includes a verbal reprimand before a written reprimand, a written reprimand before a suspension, and a suspension before a dismissal for the same related offense. The Chief of Police or the Safety Service Director may determine that a different sequence is required.

{¶4} At the arbitration hearing, Reading Police Chief Scott Snow testified regarding Roth's employment history and performance over his lengthy career as a Reading police officer. Chief Snow explained that Reading police officers are evaluated quarterly, and that an officer's quarterly scores are averaged at the end of the year and serve as the basis for the officer's annual evaluation. An officer's performance evaluation covers the following areas: quality of work; quantity of work; knowledge; work habits; learning and self-development; dependability; initiative; judgment; personal; and behavior/temperament. An officer is given a score of one through ten in each category. A passing score on the evaluation is that of 70 or higher.

{¶5} Chief Snow compared Roth's annual performance-evaluation score to the average annual score for patrol officers in the department for the years 2013-2017. In 2013, the average departmental annual score (comprising all ten categories set forth above) was 84.4, whereas Roth's average score was 67.25. In that year, Roth was the only officer in the department with a failing score. In 2014, Roth received an annual score of 74.25, while the departmental average score was 83.88. While Roth received a passing score, his was the lowest in the department. In 2015, Roth received an annual score of 69.5. The departmental average score was 82.45, and Roth was again the lowest performing patrol officer in the department. In 2016,

Roth received a score of 69.17. His score was the lowest in the department, which had an average score of 82.78. In 2017, Roth received a score of 49. The departmental average score was 83.45.

{¶6} Chief Snow additionally testified to comments that he had written on Roth's recent annual evaluations. In 2015, Chief Snow noted that the most common complaint regarding Roth was his unwillingness and/or inability to get along with others and the significant amount of time that he spent at the station, rather than out in the field. The evaluation stated that "Officer Roth continually demonstrates a desire to keep to himself and seems to prefer to isolate himself from his coworkers rather than interact," and that "Officer Roth requires constant oversight to keep him moving, which results in complaints that he is being picked on." It further stated that "When given space, [Officer Roth] fails to perform to the same standards as other officers until the constant oversight is again put into place. His continued claims that he is being singled out hold no merit, considering that every supervisor and the Chief of Police, 11 supervisors since 1997, have all described him using these descriptors. The common denominator in all of this is Officer Roth."

{¶7} In 2016, a year in which Roth was off a portion of the year for injury and also served as a dispatcher for a portion of the year, Chief Snow noted that "Officer Roth is a marginal employee at best. He consistently rates below standard in the areas of Quantity of Work and Behavioral/Temperament and barely makes standards in other areas of his evaluation. He has been given direction and instruction year after year on how to improve those areas, but has shown to [sic] interest in making that happen. For a 20-year veteran, his ratings are deplorable."

4

{¶8} Chief Snow testified that Roth received three oral reprimands in 2017. These reprimands were received for "nonfeasance policy acknowledgment," which occurred when Roth failed to acknowledge the implementation of a new procedure and policy manual; for "malfeasance, taser discharge," when Roth failed to follow procedure after accidentally discharging his taser at the station; and for antagonizing a mental patient and behaving rudely to hospital staff while responding to a call, which resulted in Roth being given remedial training.

{¶9} Chief Snow further testified that Roth was issued a written reprimand on October 11, 2017, for failing to meet performance standards in the year 2016. He explained that Roth had not been disciplined immediately following his performance evaluation in 2016 because Roth appealed his 2016 annual performance evaluation to the Reading Civil Service Commission. The written reprimand was issued to Roth shortly after the Civil Service Commission upheld his 2016 performance evaluation. That reprimand stated that Roth had failed to meet acceptable performance standards in both 2015 and 2016; that Roth's scores for the first three quarters of 2017 showed an average score of less than 50; and that, beginning in the fourth quarter of 2017, Roth would be held responsible on a quarterly basis to meet the departmental standard and that if he failed to do so, Reading would proceed with the necessary steps to terminate his employment.

{¶10} Chief Snow testified that Roth was issued a letter in February 2018 informing him that he had received a score of 44 on his evaluation for the fourth quarter of 2017. The letter referenced the previous written reprimand that Roth had received in October of 2017, and stated that Roth had been warned that his failure to score a 70 or higher on his quarterly evaluations would result in his termination.

Roth was given a predisciplinary hearing. Chief Snow explained that Roth took issue at the hearing with the evaluation of his "quantity of work," referred to Reading as having a "quota system," and argued that he had not been warned that his continued poor performance could result in termination or given time to improve his performance. Chief Snow disagreed with Roth's characterization of Reading's quantity-of-work evaluation standard as a quota, and testified that Roth was given multiple chances to improve his performance, including working with multiple supervisors and being sent to remedial training. According to Chief Snow, termination was the only course of action based on Roth's multiple-year record of inadequate performance, his defiant attitude when presented with constructive criticism, and his disciplinary issues in 2017.

{¶11} Reading Police Lieutenant Doug Ferrell also testified at the arbitration hearing. Lieutenant Ferrell conducted the quarterly performance evaluations of Roth in 2016 and 2017. He discussed the reports in detail, as well as testified regarding several incidents in which he took issue with Roth's performance. Lieutenant Ferrell found that Roth spent excessive time at the station working on reports, claiming that he had little time to engage in proactive police work. He noted that Roth refused to accept responsibility for his poor evaluations, and rather maintained that he was singled out or nitpicked by his supervisor.

{¶12} The FOP presented testimony from Barry Gray, an FOP senior staff representative, and from Roth. Gray testified that he was unaware of any other Reading officers being terminated without progressive discipline. Gray additionally testified that, in his opinion, the written warning given to Roth was issued in

6

retaliation for Roth's act of appealing his performance evaluation to the Civil Service Commission.

{¶13} Roth testified that after he received the written warning in October 2017, he lacked sufficient time to improve his performance because he received the reprimand (which stated that would be terminated for failure to score a 70 or above on his quarterly performance evaluations) on October 11, 2017, 11 days into the fourth quarter of 2017. At that point, he believed his scores were already "dismally low" without cause and that he had no chance to raise them. Prior to receiving the written warning, Roth was unaware that a low performance review score could result in his termination. Roth further testified as to his version of the episodes for which he received oral reprimands. In some instances he conceded that his performance was not satisfactory, and in others he challenged his supervisors' assessment of him.

{¶14} The arbitrator issued a decision sustaining the FOP's grievance in part and overruling it in part. He found that Reading had just cause to discipline Roth, noting that the subpar ratings of Roth were warranted, that the ratings were not based on the bias of Roth's supervisors, and that Roth had been given an improvement plan and counseled about his low ratings. The arbitrator stated that "[b]ased upon the notice and warnings given to the Grievant that he could be disciplined for failing to bring up subpar ratings and specifically, that the City would take steps to remove him from employment for failing to meet the standard (Score 70 or above), and the fact that he did not bring up his score as mandated, I find the City had the right to discipline the Grievant."

{¶15} But the arbitrator further determined that the termination of Roth's employment was not the appropriate discipline in this case because of the

progressive discipline policy in the CBA. The arbitrator acknowledged that the principles of progressive discipline were not required to be used in every instance and that the CBA allowed the chief of police or safety service director to determine that a different sequence of discipline is required. But he determined that in light of the language in the CBA that "progressive discipline will normally be followed," there must be a reasonable and nonarbitrary basis for not following the normal steps of progressive discipline. The arbitrator found that Roth's behavior was not a violation of law and did not equate to gross misconduct, and he offered the following statements in support of the determination that termination was not appropriate discipline:

> First, ignoring the spirit of the [CBA] to normally use progressive discipline requires justification. Comments on a Performance Evaluation that an employee is performing below an acceptable standard and must improve is not discipline. If an employee is given discipline, he/she is aware of the severity of a next step and has an opportunity to file a grievance that is reviewed by a neutral party. In this case, the issuance of discipline to the Grievant for his conduct in performing his job is convoluted. Verbal reprimands were given in 2017, but none of the discipline in those instances was elevated to the next level of discipline. The City issued a Written Warning in late 2017, but it was for conduct that preceded the Verbal Reprimands and was in regard to performance in a prior year.

> \*    \*    \*

8

Secondly, since the City failed to discipline the Grievant for many years in the past for his subpar performance, it cannot be concluded that he had advance notice that he would be immediately terminated for failing to meet minimum standards.

And third, moving from a written reprimand to a termination, which was delivered ten months after the incident giving rise to the discipline (failure to meet minimum standards in 2016) is not in the spirit of progressive discipline designed to permit or enable an employee to improve performance.

After sustaining Roth's grievance in part, the arbitrator modified the discipline imposed on Roth from a termination to a five-day suspension.

{¶16} Reading filed a motion to vacate the arbitrator's award in the court of common pleas, arguing that the arbitrator exceeded his powers in violation of R.C. 2711.10. The FOP filed an application to have the arbitrator's award confirmed. The trial court issued an entry determining that the arbitrator's award drew its essence from the CBA and was not arbitrary or capricious, denying the motion to vacate the arbitrator's award, and granting the application to confirm the award. Reading now appeals.

### The Arbitration Award Must Be Upheld

{¶17} In a single assignment of error, Reading argues that the trial court erred in determining that the arbitrator's award drew its essence from the CBA and in denying Reading's motion to vacate and confirming the arbitration award.

{¶18} When reviewing a trial court's order confirming, modifying, vacating, or correcting an arbitrator's award, we must accept the trial court's findings of fact

that are not clearly erroneous but decide questions of law de novo. *Portage Cty. Bd. of Dev. Disabilities v. Portage Cty. Educators' Assn. for Dev. Disabilities,* 153 Ohio St.3d 219, 2018-Ohio-1590, 103 N.E.3d 804, syllabus.

{¶19} An arbitrator has great latitude in issuing a decision, as long as the arbitrator acts within the scope of the parties' contract. *Cedar Fair, L.P. v. Falfas*, 140 Ohio St.3d 447, 2014-Ohio-3943, 19 N.E.3d 893, ¶ 6. An arbitrator's award can only be vacated under the limited circumstances set forth in R.C. 2711.10. Here, Reading argues that the arbitrator's award must be vacated pursuant to R.C. 2711.10(D), which provides that "[t]he arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." Reading contends that the arbitrator exceeded his power by requiring progressive discipline and ignoring the language in the CBA authorizing the chief of police to use his discretion to determine that a different sequence of discipline was required.

{¶20} Arbitrators exceed their powers when they go "beyond the authority provided by the bargained-for agreement or by going beyond their contractual authority to craft a remedy under the law." *Falfas* at ¶ 7. As long as the issued award draws its essence from the parties' agreement, an arbitrator has acted within his or her ability to craft an award. *Id.* An award draws its essence from the parties' agreement where "there is a rational nexus between the agreement and the award, and where the award is not arbitrary, capricious or unlawful." *Id.*, quoting *Mahoning Cty. Bd. of Mental Retardation & Dev. Disabilities v. Mahoning Cty. TMR Edn. Assn.,* 22 Ohio St.3d 80, 488 N.E.2d 872 (1986), paragraph one of the syllabus; *Bd. of Trustees of Anderson Twp. v. Anderson Twp. Professional*

10

*Firefighters Assn.*, 1st Dist. Hamilton No. C-180371, 2019-Ohio-2302, ¶ 11. But an award departs from the essence of the agreement when it conflicts with an express term of the agreement or is without rational support or unable to be rationally derived from the terms of the agreement. *Falfas* at ¶ 7; *Bd. of Trustees of Anderson Twp.* at ¶ 11.

{¶21} Here, the arbitrator's award drew its essence from the CBA, specifically Section 10.2. As set forth above, Section 10.2 provides that the principles of progressive discipline will "*normally* be followed with respect to conduct which could not be a violation of law or classified as gross misconduct." It further provides that "[t]he Chief of Police or the Safety Service Director may determine that a different sequence is required." The arbitrator found that Roth's conduct was not a violation of law and could not be classified as gross misconduct. Under Section 10.2, such behavior would normally warrant the imposition of progressive discipline. As Roth had already received verbal and written reprimands, the next step in the progressive discipline hierarchy would be a suspension, rather than dismissal.

{¶22} In determining that Roth's behavior warranted the imposition of progressive discipline, the arbitrator did not issue an award that conflicted with an express term of the CBA. In fact, the arbitrator specifically recognized that the chief of police and safety service director have the authority to determine that a different sequence of discipline may be required—but he found that there was no reasonable or nonarbitrary basis to impose a different sequence of discipline in this case, particularly where the conduct at issue was not a violation of law or gross misconduct.

{¶**23**} While CBA Section 10.2 provides that the chief of police "may" determine that a different sequence of discipline is required, it is silent as to under what circumstances such a determination would be warranted or supported. Because the CBA did not address this issue, the arbitrator determined that there must be a reasonable, nonarbitrary basis for doing so. It is within the arbitrator's authority to interpret the parties' contract, as he did in this case. *See Cleveland v. Cleveland Police Patrolmen's Assn.*, 2016-Ohio-702, 47 N.E.3d 904, ¶ 23 (8th Dist.) (where a dispute is resolved through arbitration, the parties bargained for and agreed to accept the arbitrator's interpretation of the contract or agreement). Such a determination did not conflict with the CBA and was not arbitrary, capricious, or unlawful. The award draws its essence from the CBA.

{¶**24**} We recognize that Roth has a lengthy disciplinary history, as well as a consistent history of subpar-performance evaluations. Roth had multiple opportunities to improve his performance and failed to do so. We also recognize that a chief of police must have the ability to control her or his department and to impose discipline when necessary. The parties bargained for the inclusion of Section 10.2 in the CBA, which provides the chief with the discretion necessary to do so. But in so bargaining, the parties failed to include under what circumstances the chief would be justified in departing from the principles of progressive discipline. As such, they left that determination open to the arbitrator.

{¶**25**} The arbitration award drew its essence from the CBA and the arbitrator did not exceed his authority. We consequently hold that the trial court did not err in denying Reading's motion to vacate the arbitration award and in granting

the FOP's application to confirm the award. Reading's assignment of error is overruled, and the judgment of the trial court is affirmed.

Judgment affirmed.

**BERGERON** and **CROUSE, JJ.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.